

June 13, 2022

**By ECF**

The Honorable Valerie E. Caproni
Thurgood Marshall, United States Courthouse
40 Foley Square
New York, NY 10007

Re:  *United States v. Gallagher*, No. 22-CR-122-001 (VEC)

Dear Judge Caproni:

 We respectfully submit this memorandum on behalf of Mr. Steven Gallagher ("Steve") ahead of his sentencing on June 27, 2022.

 Steve is a good person who came from an impoverished background to build a successful magazine distribution business that provides fruitful employment to more than a dozen employees in the economically distressed Toledo, Ohio area. More importantly, however, Steve is a devoted family man. He is the father of two grown children and the loving husband of Kristen Gallagher, his wife of more than 20 years. Steve also, in the heat of the GameStop retail trading frenzy of January 2021, made a terrible decision to deceive his Twitter followers with false posts about his holdings in SpectraSciences (SCIE).

 Steve has accepted complete and total responsibility for his crime, which resulted in an unjust gain to him of $21,716. He pled guilty pre-Indictment to this offense, just months after his arrest without the benefit of any discovery from the government. He has followed this Court's pre-sentencing directives and mandates without fail. He has even agreed, pending approval from this Court, to have the $21,716 that he owes in forfeiture subtracted directly from his secured bond. Steve stands before this Court with remorse, embarrassment for his conduct, and with the utmost shame for knowing that if even *one* of his Twitter followers lost money due to his unwise tweets about SCIE, that would have been one too many.

 United States Probation ("Probation"), after a lengthy interview and a detailed evaluation of the circumstances of the crime and Steve's life, recommends that Steve receive a sentence of time served and probation. Based on his background and the offense conduct, we agree with Probation's recommendation. The applicable Guidelines also support a non-custodial sentence. Steve's sentencing guidelines range of 8 to 14 months of imprisonment falls well-within Zone B of the Guidelines. Zone B sentences can be fulfilled, at least in part, with various alternatives to imprisonment, such as community confinement, home detention, or even a sentence of probation that includes some form of alternative confinement.  Probation does not recommend any type of confinement, however, because it recognizes that that *any* sentence of imprisonment or confinement would be "greater than necessary" due to the low loss amount of the crime and Steve's impoverished upbringing, which he overcame to achieve remarkable success in life. Therefore, we respectfully ask this Court to follow Probation's recommendation for those

reasons and others, as set forth below, and impose the recommended sentence of time-served and probation, together with a fine of $10,000 and forfeiture in the amount of $21,716.[1]

## I. The Life of Steve Gallagher

### A. Steve's Early Life in Toledo, Ohio

Steve's story begins at 18 Reed Street in East Toledo, Ohio, where he was born on January 12, 1971. *See* Exhibit A (showing pictures of Steve's childhood homes). Steve's mother, Carole, came from an abusive, alcoholic family, and she was just 20 years old when she gave birth to Steve. Shortly after Steve was born, his father impregnated another woman, and he abandoned the young family. Steve was just a year old when this occurred, and Carole was left to care for her infant all alone. Carole could not even afford a crib, and Steve spent his early months using a dresser drawer for a crib. Yet it was under those circumstances that Steve was thrust into the world, living in a tiny apartment in a decrepit building on Reed Street, nearly adjacent to the interstate 280 overpass in Toledo.

Steve's mother worked hard as a clerk at a local bank, and in time, the family's economic circumstances improved. When Steve was young, he moved to a small home located at 241 Graham Street in East Toledo. *See* Exhibit A at 1. Then when Steve was in high school, the family moved again to a home with a yard located at 5888 Nebraska Street in Toledo. *See* Exhibit A at 2. Steve's extended family included many alcoholics, and Steve, at times during his early childhood, felt that he was "living with drunks." Steve even witnessed his step-grandfather physically beat his mother.

When Steve was just two or three years old, his mother began dating a man named Mike Faoiz. Mike helped raise Steve as he grew from being a toddler to a child to a young adult. In high school, Steve's mother married Mike and took his last name. Today, Steve refers to Mike as the "greatest guy in the world," and a "terrific step-father." While Steve was raised primarily by his mother and step-father, over time, Steve's biological father came back into Steve's life. Ultimately, Steve and his biological father, who passed away in February 2021, reconciled and became close.[2]

Steve's tough homelife found no respite at school. Steve recalls that when he was in the first or second grade, the worst time of day was when the school dismissal bell rang and Steve was forced to run home in order to avoid being beaten by his classmates. After grade school, Steve attended Rogers High School in a poor section of Toledo. Steve was heavily bullied all through high school and he had very few friends. And his friends similarly suffered from rough

---

[1] While Probation recommends three years of probation, for the reasons set forth within this letter, Steve respectfully requests that only two years be imposed.

[2] Nena Gallagher, who was married to Steve's biological father up until his father's death of February 1, 2021, describes Steve as a "great son" who had been "quite close to his Dad before his death." See Exhibit B, Tab 25. Ms. Gallagher relates that they spent "at least a day every week together sharing their lives. Steve showed himself to be a loving and helpful son to his Dad and despite his devastation when his Dad died he was there for me and helped me immensely after his death."

circumstances. Steve recalls one of his high school friends, Ritchie Vanderbilt, later served seven years in prison for bank robbery.

Predictably, Steve never did well academically. In high school he had a C average. Steve did not even attend his high school graduation, preferring to start work immediately after earning his high school diploma. But for all his academic shortcomings, Steve excelled at working hard. He made it the center of his life. From an early age he exhibited the work ethic that would later serve him in running his magazine company. As Steve's mother describes in her letter to the Court, she "knew at a young age that Steve was destined to be successful" because of his strong work ethic. *See* Exhibit B, Tab 21. During high school, Steve, when he was 16 years old, got a job at a local Wendy's restaurant. Steve rode his bike three miles each way to work, earning just $3/hr. Steve worked at Wendy's multiple nights each week for all three years of high school.

During his senior year of high school, Steve got a job at an Ace Hardware in Toledo. He was soon fired because he had misread a customer order and inadvertently shipped 100 garden hoses to a customer located across the country. This was the first time, at 18 years of age, that Steve recognized that he had a vision problem. Of course, given his eagerness to work, he quickly began wearing corrective lenses so that he would never make a mistake like that again. Further, that it took being fired for misreading a purchase order at a second job shows the lack of support Steve received during these years.

Looking back on Steve's childhood, Steve's mother Carol notes that Steve mostly accepted their family's lack of material comforts as well as his lack of a father figure for portions of his childhood. Carole writes: "I was a single mom in his younger years. He never took advantage of the situation to try to get away with things. He knew we couldn't afford certain items and didn't push to get them. He played sports, attended school activities, and didn't get into any real trouble during that time."

For approximately a year and a half after high school, Steve, living in a friend's basement for $75 a month, worked at a sporting goods store to make ends meet. It was about that time that his biological father offered to pay his way to the University of Toledo. So, at the age of 20, after a disastrous high school career, Steve enrolled in college, studying political science. Steve lasted only two years at the University of Toledo; once again, academic success evaded him. It was at that point that Steve discovered telemarketing.

**B. Steve begins a career in telemarketing, turning a dying business into a success story.**

When Steve was 21 and in his second year at the University of Toledo, his friend Gregory Von Seggern introduced him to telemarketing at a company called Periodical Publishers. The job paid $5/hour with additional compensation received as commission based on how many magazines a salesman sold. Steve initially hated it, and quit on the first day. Thankfully for Steve and Periodical Publishers, Gregory convinced Steve to go back and give the job another shot. Steve followed that advice, went back to work and thrived. That decision changed Steve's life. Steve immediately became a top performer, selling more than $1 million in magazines his very first year.

For the next thirteen years, Steve worked at Periodical Publishers as a salesman. Steve excelled and was a consistent top performer. Other employees nicknamed Steve "The King," and they bought him a big chair to sit in. Steve made the business a considerable sum of money, which helped it expand and prosper, providing employment to additional people in the greater Toledo area. Steve even helped Frank Binando, the owner, manage his co-workers. Steve was happy about his work accomplishments, and for the first time in his life, Steve, as his mother predicted, was a success.

Then, in approximately 2003, Frank made plans to retire and close his telemarketing business. The news of this potential closure was devastating for the business' employees, including Steve, and their families. Well-paying jobs in the Toledo area for people without college degrees were very difficult to come by in the early 2000s and almost non-existent now.

But for Steve, the potential demise of Periodical Publishers provided him with an opportunity to own a small business. There was just one problem: Steve, now married to his wife, Kristen, and with two young children to support, had little money. Seeing the opportunity, however, Steve borrowed funds from Hearst (the franchise owner), cashed out his 401(k), and bought the magazine telemarketing business. In retrospect, that was a good decision, as it allowed Steve the opportunity to obtain a certain financial stability that he never had growing up. But in 2002, it was terrifying for Steve and his young family.

In her letter to the Court, *see* Exhibit B, Tab 6 at 1, Steve's wife Kristen describes the life-altering decision from her perspective:

> Steve has always been very motivated to do his very best at everything he does. He started out working as a part time sales person when he was 21. He moved up within the company quickly. When the owner decided it was time to retire, he offered Steve and two co-workers the opportunity to take over the responsibility for the existing employees and start their own business. Steve was the only one willing to take the risk. One of the biggest motivational factors was simply that he did not want to see the people he worked with for the previous 10 years unemployed. He cashed in his 401K, he went a long period of time, I believe the first year, without a steady income while the business established and I continued working. He worked hard, long hours and was committed to staying hands on while also constantly traveling. He made that business into a greater success, continued to provide for his employees to this day and created a wonderful life for our entire family. He succeeded.

Steve's wife Kristen was not the only person who understood the significant risks Steve undertook in purchasing the telemarketing company, which even then was a dying business. David Massey has worked with Steve for approximately 28 years, beginning when they were employees together at Periodical Publishers, and continuing through when Steve bought the business. As David explains in his letter to the Court, *see* Exhibit B, Tab 13, he began working with Steve when he was only 18 years old: "I was a young, new father trying to find my way. Steve was instrumental in my success as an employee of the company we worked for as well as my growth as a young man. At no personal gain to himself he helped to make me a better worker and person. He even paid me to quit smoking cigarettes!" David continues on to describe how,

when Frank decided to retire, Steve "took over the business at great personal financial risk to his family." By doing this, David explains, "he ensured that my co-workers and I could continue to support our families. Since then he has employed hundreds of people. He always encourages positivity and helping others. Over the years working with him, Steve has proven to be a great friend who I truly think of as family."[3]

The magazine business under Steve, now renamed CMS of Holland (Commercial Magazine Service of Holland),[4] thrived and became a financial success. This success was important to Steve as it provided security for his wife and children, something he never had growing up. But even more important was that Steve was able to provide well-paying, high-quality jobs with benefits to his friends and co-workers. In fact, Steve took over a struggling, dying business and grew it to 25 employees, many of whom still work for him at CMS.  Sharon Klumm, a longtime employee, sums up her experience at CMS by stating that she has had the "privilege of working with and then for Steve Gallagher for 27 years." *See* Exhibit B, Tab 4.. According to Sharon, "Steve has been an inspiration since day one. He gave me goals to meet and to do the very best I could in sales, collections & customer service. Steve has always treated his employees with dignity and respect."

Kimberly Stewart, another co-worker, echoes these same sentiments, writing: "I have known Steve since 1992 when I started working for the same company he worked for. We furthered our careers with company and Steve took the company in 2004 and I have worked for him since." *See* Exhibit B, Tab 5. Kimberly explains that for Steve, his employees were not just co-workers: "Not only were we co-workers/employee but our families became each other's family on a personal level. We watched each others kids grow up, graduate from high school and college, as marriages, baby showers, etc." Ms. Stewart concludes by writing: "Steve is the type of guy who would give you the shirt off his back. We've been through ups & downs in our lives but Steve has never treated me like anything but family."

Finally, it is difficult to overstate what good, well-paying jobs (like the kind that Steve provides) mean for the citizens of northwestern Ohio, which has suffered from considerable economic decline in recent years. Steve's brother-in-law, Attorney Jeremy S. Pratt, puts it most succinctly in his letter to the Court (*see* Exhibit B, Tab 10):

> Steve works hard and provides for the livelihood of his employees by owning and operating a small business. He has worked hard to develop his business over the years, working long hours, and frequently traveling. He is continuously dedicated to the growth of his business and the personal development of his employees. He has personally invested his effort and time to ensure that his employees will continue to have reliable employment in an geographic area that has struggled economically. Steve's employees rely on him for their jobs and if he is not able to continue to manage his business, those jobs will be in jeopardy.

---

[3] Attached hereto as Exhibit D are numerous pictures documenting Steve's life, including as the owner and employee of CMS of Holland and its predecessor.

[4] Holland is a town in northwestern Ohio.

## C. Steve meets the love of his life, Kristen, and starts a family.

In 1992, shortly after beginning his life's work in sales, Steve met his future wife, Kristen, at a bar in Toledo. The night they met, Steve asked Kristen for a ride home; they have been together ever since. After just a few weeks of dating, Steve and Kristen became inseparable, and they quickly moved into a small apartment together on Glenmore Street in Toledo. *See* Exhibit C (showing pictures of homes rented and owned by the Gallaghers). In 1995, Kristen gave birth to the couple's first child, a son they named Steven Jr. In 2000, Steve and Kristen married in a private ceremony. Then in 2001, they welcomed the birth of their daughter, Kaitlyn. They have now been together 30 years, and married for 22 years. As Steve explains it (Exhibit B, Tab 30), Kristen has helped him get through the most difficult parts of his life, including his arrest and conviction in this case:

> I think it's important for you [the Court] to know how important my wife, Kristen Gallagher, has been in my efforts to battle through this most difficult point of my life. She has been positive beyond words and this has helped me stay stronger than I would have without her. I simply would not have been able to make it through this emotionally, mentally or physically any other way. The toll it has taken on her has to be immense and I'm so amazed at how she's been able to remain strong. This has taken a toll not just on me, but her possibly even more due to the emotional, mental and financial strain this has caused and I don't know how but she has always remained, strong, positive and will always be my rock. I know I can lean on her support as often and as much as necessary and that means more than anything to me.

For Steve, his family is everything to him, and the ability of Steve to provide his wife and children with a better life than he had growing up is central to an understanding of who Steve is as a person. Given his upbringing, part of Steve's motivation to achieve success was to further his goal of providing for his family financially. As an example, in 1995, when Steve was just 23 years old, he and Kristen purchased a home together in Holland, Ohio, a suburb of Toledo, for $40,000. *See* Exhibit C at 2. This modest home was Steve's first real time living outside the Toledo city limits. But for Steve, the ability to become a homeowner and to provide for his family, meant an opportunity for them to escape the streets of Toledo that Steve grew up on, and to have a chance for his children to achieve their hopes and dreams that had escaped Steve. Through Steve and Kristen's hard-work, they went from poverty to a solid upper-middle class existence where they were able to provide for and shelter their family. *See* Exhibit C at 4. All of this success was achieved through determination and grit over many years; none of it was obtained by buying and selling securities.

Still, as important as it was for Steve to provide his family the material goods and homes with his work, it was even more important to spend time with his wife and children and be present in shaping their lives. Steve's wife, Kristen, explains it best in her letter to the Court:

> He has always strived to provide for our kids and he always has. They grew up happy, healthy and into wonderful, loyal and hard working adults. He was always a good father who not only gave them an admiral role model but who was always there for them. He spent years coaching our son's baseball teams, going to baseball games, soccer games, tournaments

out of town, debates, spelling bees and an unending amount of school events. He was always supportive and encouraging. He made sure they felt supported while also making sure they were doing their best. They both have those qualities as adults and I am extremely happy with the people they have become.

Steve's son, Steven Jr., who now works at UPS, echoes his mother's comments about his father's involvement in his life in his own letter to the Court (*see* Exhibit B, Tab 8):

My dad has always been a part of my life and has been there for me, my sister and mom in all the ways a dad should be. I remember when I was little, my dad coached my baseball teams, sometimes whether he actually intended to or not. My dad was always at all my events that he was able (since he did travel for work) whether it was a school event, baseball game or soccer game. For my birthdays, my dad did things to make them special and I specifically remember the trips he took me and my friends to Columbus to The Columbus Crew soccer games even though they played 2 1/2 hours away. I know my dad liked making sure we all had fun and were happy.

Steve's daughter, Kaitlyn, who is in college studying to be a psychologist, describes how her father could always be counted on to provide for the family and "take care of everyone" (*see* Exhibit B, Tab 16):

My father has been there for me my entire life. Though we never had the easiest relationship, he always supported me, and everyone around me. I knew I could always count on him. Throughout my life, he wanted nothing but to help people. He was always, without a thought, the first to grab the bill, lend a hand, or open up his home to friends and family when necessary. He was always sure to take care of everyone.

I've witnessed him work hard my entire life to provide a future for me and my future family some day, and seeing that taken away has been heartbreaking -- for him especially. All he has ever wanted to do, and talked about, was provide a future for my brother and I without having to worry about money the way he once had to. Everything he did was in hopes to create a better future for his family, and if he knew any part of it was wrong, it would not have taken place.

Friends and associates of Steve also echo in their letters to the Court just how important Steve's family is to him. For example, Grant Stephen writes, "Steve is a real down to earth person. He loves his family, talks about them all the time, a very proud dad." *See* Exhibit B, Tab 11. Steve, however, ever modest, gives himself none of the credit for the success of his children, who are "happy, health, well adjusted adults now and very productive members of society." *See* Exhibit B, Tab 30.. Steve instead praises his wife, stating that the success of his family "in large

part due to my wife being such a wonderful mother teaching those values to our children while also supporting me emotionally and working a job she loves."

### D. The History and Characteristics of Steve Gallagher

As this Court is aware, the very first "3553a" factor instructs courts to examine "the nature and circumstances of the offense and *the history and characteristics of the defendant*." As set forth below, Steve has led a life defined by generosity and a sense of commitment to improving the lives of others far beyond those in his immediate family. Letter after letter attached hereto describes Steve's true desire to better others' lives in ways both large and small.

Steve's cousin, Justin Adamski, describes how Steve has guided him by teaching him how to become a better husband and father to his children (*see* Exhibit B, Tab 1):

> I went from looking up to him as my older cousin when I was a child to learning from him as the respected businessman and father he has become throughout the last several decades. In that, Steve has contributed immensely to helping me become the type of husband and father I am today. He showed me what a great father and husband should be. He has always been willing to give a listening ear so I can vent, helping me work through my day to day problems sometimes just by being there for me or listening. I know he does the same for so many others. I've watched him sit and listen to someone for hours on end or give the shirt off his back if that's what they need. There really isn't anything he would not do to help someone he sees in need if he can.

Tyler Jechura, an attorney and friend of Steve, expressed similar sentiments about Steve's willingness to sit with people and help them work through their problems (*see* Exhibit B, Tab 2):

> I have known Steve for nearly a decade. Simply put, he is one of the most honorable people I know. Steve is the kind of person who is always willing to put others first, exercising care and concern above all else. I have lost count of the times I have seen him sit with someone while they vent to him about problems they are having. He has never judged. He listened each time, always making sure they are in a better place after they've talked than they were before. He is charitable. He has raised more money to fight cancer than any person I know. Helping society has always been a priority of his.

William Boone, the owner of "Will's Asphalt Seal" in Toledo, who is also a friend of Steve's, emphasizes that when evaluating Steve as a person, it is critical not just to focus on what Steve did wrong, but to examine the whole person, including what good he has done throughout his life (*see* Exhibit B, Tab 7):

> I first met him through other people. So I've spent some of that time watching what kind of person Steve is. He's always been the person who will sit down and talk with anyone and everyone. It doesn't matter if you're an employee in a restaurant or his best friend, he truly treats all people the same. I know that sounds cliche but it's just the truth. I've watched Steve check on people to make sure they're doing ok when they look down, or they're eating enough when they look

stressed. If someone is in need, Steve has always been one to help out. You don't have to ask because he offers. He's sometimes loud, he's funny and he's entertaining but he also has a kind soul and truly cares for others. Steve has a good heart and it shows through his life, his action and his devotion to people. I hope that's something that you can see as well as we, his friends, can. I know everyone must take responsibility for their own actions but bear in mind that should include all of his actions.[5]

Connie Pratt, who has known Steve Gallagher for approximately 19 years, praises Steve's dedication to others, his selfless commitment to raising funds to fight cancer, and his encouragement of people to better their own lives (*see* Exhibit B, Tab 10):

 Steve will always congratulate you on your hard work, as he knows first hand the time and dedication it takes to be successful. He was one of the first people to congratulate my husband on making the decision to go back to school for his law degree and then again when my husband graduated. Steve was also very supportive when others were not, of our decision to leave Ohio and move to Texas in search of better job opportunities. Having that encouragement meant the world to my husband and I. A few of Steve great attributes; he always been a generous, caring, and humble person. After his father had passed away, Steve set up and worked hard to raise money for the V foundation; a cancer research foundation. Since his father was a cancer survivor, it was a wonderful way to help others as well as grieve for his loss. We were all proud of what he had accomplished with this, especially my son, as it made a lasting impression on him. It showed him that anyone who puts in the time and dedication can do great things and be humble about their achievement.[6]

Jessica Leigh, Steve's cousin by marriage, praises Steve for giving her and her family support during difficult economic times. Steve provided food that allowed Jessica to feed her family and material comforts such as gifts for her children that she could not otherwise afford (*see* Exhibit B, Tab 12):

I know Steven to be both a kind and generous man. I can personally vouch for the positive influence Steven has been in my life and those of my two sons. I am a single mother and more often than not we live by very limited

---

[5] Bennett Johnson, one of the Gallaghers' closest friends, explains how Steve has "hosted many gatherings for the kids in our community as well as allowed several struggling youth to stay in there home until they were able to return home. Over the years Steve has truly proven to be a good friend and caring person." *See* Exhibit B, Tab 9.

[6] Ms. Pratt also asks this Court, in rendering judgment on Steve, to "take into consideration the impact of not just his family but the families and employees of his small business. In a town whose economy is not what it once was, these families depend on their jobs to survive. It would not only be a travesty to Steve's family, but also his employees and their families if hie could not continue to manage his business."

means. There have been innumerable meals that Steven has picked up our tab or provided my family a seat at his table. Those meals often made the difference between running out of food for the month and not. Steven opens his home to us for every birthday and holiday. Celebrations that I alone could not afford to provide for my boys. Celebrations that otherwise would have been lonely and lacking. I could go on and on about all the overly generous birthday gifts that allowed my son to have new clothing rather than second hand or special toys that otherwise would never have been purchased. The most generous act of all being that Steven never brings up the meals or birthdays, never asks or expects anything in return.

Jeremy Pratt, Steve's brother-in-law and friend, also highlights Steve's generosity and devotion to helping others in need (*see* Exhibit B, Tab 14):

Steve's generosity is incomparable. He simply thrives on helping others in whatever way he can, from lending a helping hand to offering sound advice. He has shown me his generosity many times over the years that I have known him and, though I could probably fill a notebook, the brevity of this letter will only allow me to elaborate on a few of those instances that have meant the most to me. First, after college, Steve offered me a job to work for him doing maintenance and upkeep for his rental properties while I looked for full-time employment. This act of generosity meant a lot to me because it allowed me to keep my dignity and work instead of relying on family and friends for hand-outs. Second, shortly after my family and I relocated from Ohio to Texas, I was in the process of getting my legal career started and my dad became very sick. My family had scraped together the money to visit my dad while he was in the hospital in a comma. A few weeks after we had returned to Texas our dad passed away and we were faced the challenge of having to fund a second flight back to Ohio for his funeral. Steve, without hesitation, provided for my family to fly back to Ohio so we could be with the family at our dad's funeral. Additionally, Steve donated to and started successful initiative to raise money for the V Foundation to support research to fight cancer.

Lastly, Nona Weideman, an acquaintance who has known Steve since he "was in grade school" describes how Steve spontaneously threw her a good-bye party when she was moving from Ohio to Georgia (*see* Exhibit B, Tab 15):

In 2013, I needed to relocate to Georgia due to my job, so that I could work towards my retirement. I did retire after five years and then returned to Ohio. Steve had a large gathering in his home for me so that I could have an opportunity to see dear friends and spend some time together before my parting. I have always been appreciative of that time, and of Steve's generosity and kindness. Steve has always cared for his family and many friends with compassion, mindfulness, and positivity.

While the above-listed examples provide unique insight into how Steve lived his life *before* his involvement in the crime that brings him before this Court, numerous other letters attached hereto also describe Steve's infectious generosity and desire to improve the lives of others, including people he barely knows.

### E.  Steve's involvement with over-the-counter stock trading

Steve did not set out to use his Twitter account for nefarious purposes. In fact, as Steve's wife Kristen explains in her letter, Steve "never liked or understood social media." Steve did however enjoy the 1971 movie Clockwork Orange, which provides social commentary, through the main "antagonist" Alexander DeLarge, on crime and gangs in a dystopian Britain. Thus, shortly before the pandemic began, Steve created a meme Twitter account in the name of "Alexander Delarge 655321". The point of this Twitter account was for Steve to follow and provide commentary on sporting events, which Steve loves to watch and discuss with his friends. At that time, Steve had no interest in tweeting about penny stocks or the over-the-counter (OTC) market. Steve also had virtually no Twitter followers.

When the pandemic hit, the value of Steve's stock account, like that of many people, went down significantly. At this point, Steve owned very few, if any, penny stocks. Concerned by the ever-decreasing value of his securities account, Steve quickly diversified into penny stocks, hoping that the price volatility of those stocks would help him regain the value of his account that contained primarily blue-chip stocks. Lo and behold, Steve was good at investing in penny stocks. Steve partially regained his prior losses by investing in undiscovered, low-value companies that went uncovered by traditional financial analysts. Steve recognized that many of these stocks were not going to significantly increase in value, but he also believed that some of these stocks would skyrocket in price as they increased earnings, developed products, acquired funding, and uplisted to Nasdaq. Steve wanted to find these diamonds in a rough, and with his telemarketing business on hold due to Covid, he had significant time to devote to this research.

Steve was already sharing his opinions on sports, television, and other topics on Twitter, and so thought nothing at first about sharing with the Twitter world the stocks that he was purchasing. So, he began tweeting about stocks that he was buying, or stocks that he was considering purchasing. None of that is illegal as the Securities and Exchange Commission has made clear.[7] Steve truly believed that with his tweets and stock picks he was helping people acquire wealth. Nonetheless, Steve always warned people to do their own due diligence, that the stock picks were just his opinion, and he encouraged people to, like him, take profits (sell stocks) and buy the dips and sell the rips (purchase stock

---

[7] *See, e.g.*, Kevin Stankiewicz, *Ex-SEC Chief: Reddit-Fueled GameStop Frenzy Was Not a Modern-Day Pump-and-Dump Scheme*, CNBC (Feb. 19, 2019) https://www.cnbc.com/2021/02/19/jay-clayton-reddit-fueled-gamestop-frenzy-not-a-pump-and-dump-scheme.html (former SEC Chief Jay Clayton explained in an interview that that the Reddit-fueled GameStop social media frenzy was not illegal because, amongst other reasons, the retail traders were not pushing out "false and misleading" information over social media).

when the price went down and sell when the price increases), but he wouldn't advise when to sell or tell people when he himself was selling, out of fear that his sales could hurt the stock:

- On July 6, 2020, Steve tweeted: "Again! I will never say sell a stock. Or [say] when I sell. But I will say always take profits! Always secure free shares. Add dips. . . ."

- On November 28, 2020, Steve tweeted: "Take profits at your own will I never say Sell that's on the trader."

- On January 1, 2021, Steve tweeted: "Yes I take profits by selling smart or I don't sell! . . . I'll never say sell or sold a stock! That hurts people invested! I buy red days sell small on rip days and repeat."

- On February 21, 2021, Steve tweeted: "OTC stocks? Most are bankrupt! Most are scams! I'm not a professional trader! I do my best to find the hidden Gems! Please do your own DD I share what IMO have great upside! But overall I've been right more than wrong learning as I go!  Goals help others and KILL CANCER!"

Over time, as people began to appreciate Steve's analysis of stocks and trading tips, Steve began slowly accumulating Twitter followers and enjoyed sharing his winners. In March 2020, Steve had approximately 200 followers; in July 2020 he had 4,500 followers; in October 2020, he had 8,200 followers, and in December 2020, he had nearly 20,000 followers. The accumulation of followers, and Steve's newfound ability to interact with people and help them with their lives, made Steve happy. In the midst of a pandemic, Steve had found his new community, and he loved it.

Steve's daughter, Kaitlyn, tells it best in her letter to this Court (Exhibit B, Tab, 16):

> When he found twitter, and began obtaining a following, I was more than happy for him. He finally had an outlet, and something he was good at -- helping people. It was the weirdest thing, my dad blowing up on twitter, but he excelled at it. He entertained people, he created a community of friends and family. People looked up to him, reached out to him, offered him money for his help, and he wanted nothing from it. He just wanted to help people, and knew that what he was doing was making a difference. And it was. He was helping so many people, or else he would not have obtained the following that he did. And through the past few years, I know that is all he ever wanted to do. I know, if he knew any of what took place was wrong he would have stopped in his tracks. The last thing he wanted to do was hurt anyone. Stealing, and taking money from those who were vulnerable was the absolute last thing my father was trying to do.

Likewise, Steve's wife Kristen describes how Steve literally fell into being a successful Twitter personality (Exhibit B, Tab 6):

Steve never liked or understood social media, so it was a shock to all of us when after sitting home due to covid without a business to focus on, he decided to start a Twitter account. Honestly, we laughed. He talked about gaining a following and being an entertaining sports personality. It became a family joke since he was the last on social media and least likely to understand it. However, as he found a niche community in what they call Fintwit (Financial Twitter) and found a passion in stocks. As he expressed his interests and excitement in different stocks, his following grew exponentially. We quit laughing.

Financial fraud schemes, particularly in the penny-stock arena, thrive because unscrupulous individuals take advantage of unsuspecting customers by lying to them. Promoters fail to disclose money that they're getting paid to tout stock; insiders do not disclose their controlling positions in small companies; insiders pay others to create fake press releases or run boiler rooms; and, still others pretend that they are financial advisors who can guarantee easy returns. Steve did none of that. Steve directed people to do their own research. Steve never once did a paid promotion. Steve was never part of an insider "control" group. Steve never had or traded on inside information. Steve certainly did not create or distribute fake press releases or operate a boiler-room. Instead, as further described below, Steve directed his followers to donate to the "V Foundation," a non-profit charity aimed at curing cancer.[8]

In her letter to the Court, Steve's wife Kristen explains how Steve directed his Twitter followers to support the "V Foundation":

> When people asked to pay him because his recommendations paid off, he always refused. When these small companies approached him about promoting their particular stock or company in exchange for compensation, he refused. He started his campaign in support of The V Foundation and I was extremely proud of him for even thinking of how to use his increased notoriety for something so pure and positive. Even in this he excelled amassing over $168,000 in donations for cancer research.

For Steve, the V Foundation was not a new hobby or activity either. As Steve's daughter describes it in her letter, "the Jimmy V foundation has always been a huge part of his … life." She notes that "[e]very single year, though I often dreaded, he gathered the family to watch Jimmy Valvano's last speech as he was fighting a hard battle with cancer." For the Gallagher family, fighting cancer had always been important because, as Kaitlyn explains, "three of four of my biological grandparents have had and struggled with cancer." For Steve, "he immediately used his following to support and donate

---

[8] The "V Foundation" is a cancer fighting research charity founded by legendary basketball coach Jim Valvano. As the V Foundation explains on its website (v.org), "[s]ince its formation in 1993, the V Foundation has awarded nearly $290 million in cancer research grants nationwide and has grown to become one of the premier supporters of cutting-edge cancer research. Due to generous donors, the Foundation has an endowment that covers administrative expenses."

towards the Jimmy V foundation." Steve "denied the offers of money [from his Twitter followers] but insisted on donating here instead. He was hoping to raise a million dollars in donations to kill cancer, but managed to reach up to $168,000," which is approximately *eight times* what Steve earned through his involvement with SCIE. Steve even donated nearly $15,000 himself to the V Foundation, on top of the countless hours of work he put in, as his wife tells it, arranging:

> multiple sales of shirts, sweatshirts and hats so that even more proceeds could be raised for the V Foundation. Every penny that came from these sales went directly from the company to The V Foundation. All the work he put in for these drives from the initial idea for the merchandise to making sure everyone received their order, he did for free. He put in so much of his own time, effort and ideas just because it would benefit those with cancer.

That is who Steve Gallagher is.



Steve also believed that he was helping his Twitter followers by tweeting about his penny-stock success. Attached to this letter (at Exhibit F) are dozens of public and private messages of support directed at Steve and praising Steve for helping social media users gain money through over-the-counter trading. A few of these tweets and DMs are particularly noteworthy:

- On June 20, 2021, "@dloon89" tweeted and tagged Steve: "Follow these awesome people if you want to have a bright future! They've all helped me tremendously over the past 12 months since I switched from the Listed Market to the OTC!"

- On August 2, 2021, "@jesseforbey" tweeted: "I'm a huge believer in you, Alex, so don't think that was a knock towards you! Your plays have helped me a ton."

- On January 2, 2021, @PolishRachel tweeted, "I started trading with 7800, throwing money and seeing what stuck. Down to 3000, 2 weeks and ready to give up … @AlexDelarge6553 helped me so much. I prob drove them crazy! But they taught me how to do dd, take profits, and I will be forever thankful."

- Austin Investments, who uses the screen name @StockTraitors, sent a DM to Steve on June 25, 2021, stating: "You've helped me make a good amount of money bro. Much thanks.

- In January 23, 2021 Yolonda, who uses the handle @YoloOT4life sent a tweet directed at Steve: "I'm up, thanks to him! I just think I'm not buying enough shares when I go in. Looks like many are copping like 500,000 when they buy in. I'm catching on and doing my DD but he has definitely provided great picks."

While social media can, at times deservedly so, earn a bad reputation, particularly in the financial Twitter world, the outpouring of support for Steve, also sent to him or tweeted prior to his arrest in this case, shows that he helped far more people than he ever hurt.

### F. The criminal offense

As this Court is aware, Steve has pled guilty to making false statements about his financial position in SCIE, one of hundreds of stocks that he traded and tweeted about during the pandemic. Steve takes full and complete responsibility for his criminal conduct with regards to SCIE, which has resulted in a gain to him of $21,716. However, it is critical to understand that Steve did not purchase stock in SCIE with the goal of intentionally defrauding his Twitter followers. Instead, what happened is that SCIE, due largely to the GameStop retail feeding-frenzy phenomenon, entered into a period of market volatility in late January 2021. *See* Exhibit E at 2. This resulted in Steve making an extremely poor decision to misrepresent to his Twitter followers his ownership stake and trades in SCIE, with the goal of keeping the SCIE stock price above water.

SCIE, in early December 2020, was a publicly traded shell company. Very few shares traded each day, and the price per share was a small fraction of a cent (approximately 3,333 shares could be purchased for a dollar). On December 4, 2020, the trading volume of SCIE skyrocketed for some unknown reason, and approximately two billion shares traded hands. At that point, Steve had *not* purchased a single share of SCIE. He was not responsible for the newfound interest in SCIE. However, because of that trading volume, a fellow Twitter user alerted Steve to SCIE, and Steve, in turn, purchased a small quantity of SCIE shares (approximately $3,000 worth). Steve also began publicly tweeting that he was purchasing SCIE, ultimately accumulating 26 million shares (less than $8,000 worth of stock). There was no deception, and Steve's purchases, a miniscule fraction of the overall market, did not move the stock price, which remained flat into January 2021.

The end of January 2021 is where things went haywire. At that time, the retail purchasing frenzy that culminated in the GameStop squeeze was beginning to come to fruition, as retailer traders were attempting to force higher the price of GameStop in order to punish the hedge funds that had shorted the stock. The significant market volatility, which saw numerous stocks double or even triple in value in a single trading day, had a spillover effect on the overall stock market, including stocks listed on the OTC market such as SCIE.

The result was utter market chaos, none of it attributable to Steve. SCIE, on a single day, January 27, 2021, traded nearly one billion shares. Steve, by comparison, held at most 26 million shares. On the morning of January 28th, the price of SCIE rose sixfold between 9:30 and 9:35 a.m. with more than 851 million shares trading hands within the first ten minutes of trading. *See* Exhibit E at 1. The stock then plummeted, and throughout the day the stock gyrated back and forth on volume of nearly 3.5 billion shares. Meanwhile, other external factors related to the GameStop squeeze added to the calamity. As people publicly tweeted that day as the price of SCIE gyrated, some online retail brokerages limited buy orders while others simply crashed due to the heavy user traffic.

As Steve admitted at his plea hearing, it was this stock price volatility, coupled with the extreme volume, that resulted in him making false tweets:

> During this time period, and because of the reaction to the market volatility during that specific time period, I sent a few Tweets about my personal financial stake in SCIE that were false. As examples of tweets, on January 28, at 9:48 a.m., I tweeted out a screenshot of a buy of SCIE of 1 million shares, valued at $3,500. This screenshot was accurate, however, I had just sold shares in my account and I did not disclose that. Likewise, on the morning of January 29, 2021, at approximately 10:28 a.m., I tweeted out "SCIE I'll hold." Approximately one minute later, I sold one million shares at .0015, for a total value of $1,500. As the price of SCIE fell, I continued to sell and tweet statements like "I don't bail" and "SCIE I'll hold" while I continued to sell portions of my SCIE shares. I knew that these Tweets concerning my stock holdings of SCIE were wrong because I was selling some of my SCIE position at the time that I put out these tweets, thereby misrepresenting my financial position to others.

Without doubt, Steve made an enormous, life-changing error. In a misguided attempted to prop up the price of SCIE, he tweeted out information about his own personal trading in SCIE that was not true, and for that, he is profoundly sorry. As Steve describes it in his sentencing letter to the Court, he "will forever be remorseful for the pain and stress I have caused due to my behavior." Yet it is important to remember that Steve did not, from the inception of his purchases of SCIE, enter into a scheme to dupe his Twitter followers into purchasing SCIE. He was not part of a pump and dump; nor could he have been given that his trading represented a tiny fraction of the overall SCIE market. Instead, caught up in the frenzy of the GameStop moment, Steve made a horrible decision not to tell the truth, and for that, he accepts total responsibility, and will forever remain a felon convicted of securities fraud.

## II. Sentencing Analysis

### A. Legal Standard and Sentencing Guidelines Calculation

Under 18 U.S.C. § 3533(a), a court "shall impose a sentence sufficient, but not greater than necessary" in order to achieve the specific purpose of sentencing. To achieve this goal in sentencing, the court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant," along with a series of additional factors set forth in the statute. *Id*. One additional factor is the sentencing guidelines for the crime committed by Steve.

Here, the parties have stipulated, and Probation has agreed, that Steve's total offense level is 11. Given that Steve has no criminal history, the applicable guidelines range is 8 to 14 months of imprisonment. Of course, the guidelines are not mandatory and a within-guidelines range is not even presumed to be reasonable. *Nelson v. United States*, 555 U.S. 350, 351 (2009) ("The Guidelines are not only *not* mandatory on sentencing courts; they are also not to be *presumed* reasonable.") Nonetheless, it is important to note that the Guidelines Range here falls squarely within Zone B of the Guidelines. This guidelines range provides a strong foundation for the probationary sentence sought by Steve.

In that regard, for defendants in Zone B of the guidelines, courts are directed to consider non-incarceration sentences like probation in combination with other conditions such as, for example, intermittent confinement, community confinement, or home detention. Section 5B1.1 Note 1. In addition, Application Note 4 to 5C1.1 specifically states that if, like here, "the defendant is a nonviolent first offender and the applicable guideline range is in Zone A or B of the Sentencing Table, the court should consider imposing a sentence other than a sentence of imprisonment …". Here, Probation has concluded, in accordance with Application Note 4, that a sentence of probation is appropriate. Steve respectfully asks this Court to follow this recommendation and impose a two-year probationary sentence, together with a fine $10,000 and forfeiture, as set forth in the plea agreement.

### B. The Nature and Circumstances of the Offense

In addition to the Guidelines, the Court must consider the "nature and circumstances of the offense" in arriving at a just sentence. It cannot be disputed that this factor, which includes a total gain amount to Steve of just $21,716, weighs heavily in favor of probation.

*First*, Steve did not engage in a lengthy scheme designed to defraud his Twitter followers. Rather, as set forth in the PSR, and as described above, the spur-of-the-moment misrepresentations that he made concerned trading on just two or three days in late January 2021. While Steve has accepted full responsibility for his crime, it is critical to point out that this was not some carefully orchestrated scheme that lasted months. Steve, reacting to extreme market volatility, made a terrible decision to misrepresent his financial position to his Twitter followers on just a few occasions.

*Second*, Steve's role in SCIE was minimal, at best. While the government touts that Steve bought 26 million shares, as described in the PSR, those shares, which he acquired on the open market and not as part of some insider control group, were bought for less than $8,000. Moreover, Steve's actions must be considered in relation to the overall trading volume of SCIE, which amounted to approximately 3.5 billion shares on the primary day at issue (January 28, 2021). Thus, even if Steve sold the entirety of his shares on January 28th (which he did not), his trades amounted to significantly *less than* 1% of the total volume traded.

*Third*, while the parties agreed that the sentencing guidelines should be increased by four due to a "loss" of $21,716, it is critical to point out that this amount was not the amount lost by any victims. Rather, this was the amount that Steve *gained* from the offense. In fact, the government has represented to Probation (and the Court) that there "are *no* identifiable victims in this offense." Likewise, the government has asked for no restitution for victims, instead seeking only forfeiture of the $21,716. Thus, it is unclear if any victims lost funds as a direct result of Steve's SCIE tweets in late January 2021.

*Fourth*, while not technically part of the "nature and circumstances of the offense," it is imperative that the Court is cognizant of all the praise that Steve has received from other Twitter users based on his stock recommendations, indicating that Steve typically used his Twitter account as a force for good and not for nefarious purposes. Likewise, Steve rejected payments from individuals that profited from his tips, and instead directed them to donate to a cancer-killing non-profit. Through this, Steve raised $168,000, more than eight times what he gained from trading in SCIE.

C. <u>The History and Characteristics of the Defendant</u>

This factor too weighs heavily in favor of probation for Steve. As described above and in the PSR, Steve was born into poverty. Despite that, Steve worked his way up the telemarketing ladder, rising to own the company that he has now worked at for the vast majority of his adult life. This has made Steve successful, and his self-propelled upward mobility, so rare in this day and age, should be applauded. Moreover, as the letters submitted together with this letter make clear, many others rely on Steve to pay their bills and put food on the table. Steve's company CMS of Holland employs more than a dozen people, providing living wages and benefits. Without Steve's guidance, the business could go under, leaving his employees' lives as a collateral consequence of his conviction.

But Steve is much more than the owner of a successful small business. Steve is a dedicated husband, and a father to a son and daughter who mean everything to him. Despite his hard-work and up-by-his-bootstraps mentality, Steve has always found time to coach his children's sports teams, attend their events, and be ever present in their lives.

Further, as the numerous letters filed by his family and friends attest to, Steve is generous to others both with his time and his money. Steve has made a life out of helping those in need. Whether it is providing food for his extended family, presents for kids who would not have had otherwise, picnics for his employees, or lending an ear to those who are hurting the most, each of the attached letters documents that Steve has led an otherwise exemplary life dedicated to

bettering those around him. Nothing signifies this more than the fact that Steve, using his Twitter fame for good, raised $168,000 to fight cancer.

D. The Need for the Sentence

Title 18 U.S.C. Section 3553(a)(2) directs courts to consider "the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" and "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." There is no doubt that Steve committed a serious offense meriting punishment. However, as Probation has concluded, a non-incarceratory sentence of probation is sufficient, but not greater than necessary, to punish his criminal conduct.

*First*, despite the fact that he willingly spoke to federal agents on the evening of October 25, 2021 about his securities trading, the very next morning a team of agents swarmed his house and arrested him. Steve was shackled and taken to a local jail, where he waited in an orange jumpsuit for hours, before his presentment to a magistrate judge.

*Second*, Steve's arrest was publicized nationally. Steve's mugshot was posted on the evening news.[9] Story after story was written about him and his Tweeting in the national press.[10] Threats were phoned in to his business. The US Attorney for the Southern District of New York incorrectly accused him of using "old-school boiler room tactics" as part of his crime.[11] For Steve, this particular comment, which ricocheted around the Internet, nearly destroyed his telemarketing business.[12] While the storm of negative publicity surrounding Steve subsided over time, Steve remains haunted by the national humiliation he went through for a crime that, in the end, involved a gain to him of less than $22,000, which in most instances would not even be

---

[9] *Ohio Stock Trader Fleeced Twitter Users in Pump-&-Dump,* Associated Press (Oct. 27, 2021) https://www.wtol.com/article/news/crime/feds-ohio-stock-trader-fleeced-twitter-users-pump-dump-maumee-steven-gallagher/512-95aec0bd-a9a2-4979-a503-740b505c61e0

[10] *Maumee Man Facing Federal Charges for Securities Fraud, Market Manipulation,* ABC Action News 13 (Oct. 27, 2021) https://www.13abc.com/2021/10/27/maumee-man-facing-federal-charges-securities-fraud-market-manipulation/; Julian Dossett, *Twitter Use 'Alex Delarge' Charged in Pump-and-Dump Scheme*, CNET (Oct. 26, 2021) https://www.cnet.com/tech/twitter-user-alex-delarge-charged-in-pump-and-dump-scheme/.

[11] https://www.justice.gov/usao-sdny/pr/stock-trader-arrested-and-charged-securities-fraud-using-his-twitter-account-operate

[12] This one sentence, injected into a press release and tweeted out into the world by the SDNY, devastated Steve. Not because Steve was concerned about himself, but rather because Steve feared that this statement would destroy his telemarketing business, taking with it the dozen well-paying jobs of people who had little other options. Thankfully, Steve's business has survived.

charged by prosecutors.[13] Because of this humiliation, there is no danger that Steve will be a recidivist offender.

*Third*, Steve's case does not end with his sentencing here. The Securities and Exchange Commission (SEC) has pursued a somewhat parallel, albeit overbroad case, which is ongoing. That case threatens to throw Steve and his family into bankruptcy, even though Steve obtained his home and money through hard-work and perseverance over adversity. To start, Steve has to contend with the legal fees to defend that case coupled with the economic downturn that hit the Gallaghers especially hard. When the SEC first sued Steve, it froze almost all of the Gallagher's assets, including the accounts he and his wife use to run their businesses. With his assets frozen, he was unable to stem the losses and react to major market movements. Even now, the vast majority of Steve's liquid assets remain frozen. In addition, the SEC is seeking considerable sums of disgorgement and penalties that, among other calculation issues, ignore the trading losses that he incurred: in fact, Steve mostly broke even on his penny stock trading until the recent downturn.

*Finally*, it is clear that Steve has learned his lesson. Since his arrest, he has not tweeted once about stocks or even about any financial issues. Relatedly, he has been completely compliant with every term of his pre-trial release. This compliance too weighs in favor of a non-incarceratory sentence.

In short, Steve has been significantly punished already for his crime. Steve has a long way to go before his life returns to normal. A just sentence of two-years' probation will reflect the fact that Steve's life (and that of his family) has effectively been turned upside down because of his tweeting and trading.

### E. The Sentencing Guidelines Range

The Sentencing Guidelines range agreed to by the parties and adopted by Probation – a Zone B range of 8 to 14 months of imprisonment which can be fulfilled by probation when combined with other non-incarceration alternatives – is consistent with Probation's recommendation of a non-incarceratory sentence. This conclusion is further buttressed by the fact that Steve elected to plead guilty pre-Indictment, without the benefit of any discovery from the government. Steve saved the government significant resources in this unique prosecution, and his ultimate sentence should reflect the immediate acceptance of responsibility that Steve exhibited.

### F. The Need to Avoid Unwarranted Disparity

The defense is unable to find any fraud or securities cases in either the Southern District of New York or Eastern District of New York with a loss amount that even comes close to the

---

[13] We do not include this fact to minimize what he did. To the contrary, Steve recognizes that he committed a serious crime. Instead, this is included here to demonstrate that Steve has already endured a far more disproportionate "sentence" compared to the crime that he actually committed.

loss amount of under $22,000 charged here. Nonetheless, a few cases provide helpful data points for this Court:

- In *United States v. Gregory Curry*, 13-CR-00452 (EDNY), the defendant was convicted of being part of a large-scale international securities fraud ring. The defendant was held responsible for approximately $550,000 in losses, which resulted in a guidelines range of 27-33 after enhancements. Defendant received a sentence of time-served. Curry's co-defendant, who was responsible for at least $400,000 in losses which resulted in a guidelines range of 33-41 months, also received time-served.

- In *United States v. Ashley Antos*, 17-CR-372 (SDNY), the defendant was part of a $15 million securities fraud case in which she received individual profits of $42,000. Antos was sentenced to time-served.

- In *United States v. Jared Galanis*, 15-CR-643 (SDNY), the defendant was convicted of misprison of a felony as part of a market manipulation scheme that resulted in losses of between $25mln and $65mln. Galanis' guidelines range was 21 to 27 months, and he received a sentence of 150 days of imprisonment.

- In *United States v. Robert Stewart*, 15-CR-287 (SDNY), the defendant was convicted of securities fraud in connection with a tender offer that resulted in total profits of $1.1 million. Defendant himself received a personal profit of $150,000, and his guidelines range was 30 to 37 months in prison. Defendant was sentenced to four years of probation, with his first year in home confinement.

Still other (far more egregious) cases involving stock manipulation and social media resulted in no criminal cases at all. In *SEC v. Fassari*, 21-CV-403 (C.D. Cal.), the defendant engaged in a scalping campaign by which he created a fake website, falsified communications between him and the CEO of a company that he then posted on Twitter, and generally used social media to pump up the ARCS stock, causing losses of approximately $457,000.[14] Notably, Steve is a listed victim in the *Fassari* case. And in *SEC v. SeeThruEquity*, 18-cv-10374 (S.D.N.Y), one defendant earned over $500,000 running a stock research and promotion company without disclosing that the positive stock reports were, in fact, paid for, or that he sold stocks that were the subject of the positive reports after publishing the reports.

Accordingly, this factor too strongly leans in favor of a time-served sentence coupled with probation.

* * *

In sum, for the reasons set forth above, Steve respectfully requests a sentence of two-years of probation, forfeiture of $21,716, and a fine in the amount of $10,000. Such a sentence,

---

[14] Steve himself lost over $100,000 in Fassari's scheme, among his largest losses ever.

as Probation recommends, is sufficient but not greater than necessary to fulfill the aims of 18 USC 3553.

Respectfully submitted,

*/s/ Eric Rosen*
Eric Rosen
Richard Cipolla
ROCHE FREEDMAN LLP
225 Franklin Street, 26th Floor
Boston, MA 02210
(617) 977-4163
erosen@rochefreedman.com